THOMAS, Judge.
 

 Christopher S. Hatch worked for NTW Incorporated d/b/a National Tire and Battery Company (“NTW”) as service manager of NTW’s tire store located on Highway 280 in Birmingham. In October 2005, Hatch injured his back while unloading a tire truck and stacking tires. Hatch reported the injury to the store manager, Jerry LeDoux, who was also unloading and stacking tires. Hatch saw his personal physician about the pain in his back at first, but he did file a report of injury and was later assigned an authorized treating physician. Although he was in pain and was unable to perform many of his typical duties, Hatch continued to report to work at the store. LeDoux accommodated Hatch by allowing Hatch to work at the
 
 *625
 
 front counter and deal with customers instead of performing shop duties that involved lifting or overhead work.
 

 In December 2005, Garry Fox, NTW’s area director for Alabama and Tennessee stores, visited the store. Fox noticed that Hatch was having difficulty moving around the store to perform his duties. According to Fox, NTW did not have a light-duty position it could provide to injured employees. Fox told both LeDoux and Hatch that Hatch could not be on light duty and that he would need to take leave and get better.
 

 Hatch’s last day at the store was December 12, 2005. After that date, Hatch continued to seek medical treatment and was in contact with NTW’s workers’ compensation insurance carrier. However, Hatch did not contact LeDoux about his recovery progress. Hatch said that he had contacted another NTW store manager, Randy Sparks, about his progress, but Sparks was not Hatch’s supervisor. Le-Doux testified that he had tried to contact Hatch several times, leaving messages for him on both his home telephone and his cellular telephone. LeDoux said that he had explained to Fox, when questioned in May 2006, that he had not heard from Hatch and that he had tried to contact Hatch several times to no avail.
 

 Hatch did not recover from his back injury as he had expected. He continued to see his initial authorized physician, Dr. Charles Clark, for several months. Then Dr. Clark referred Hatch to Dr. Robert B. Poczatek, who, after treating Hatch for a time, placed Hatch at maximum medical improvement (“MMI”) on May 16, 2006. Because Hatch did not believe that he could not improve with different treatments, he disputed Dr. Poczatek’s decision that he was at MMI; pursuant to § 25-5-77(a), Hatch requested a panel of four physicians from which to choose a new treating physician from the workers’ compensation carrier. He selected Dr. Carter Slappey from the panel and continued treatment with him.
 

 Records from NTW’s corporate headquarters indicate that Hatch was officially placed on a leave of absence on February 26, 2006, by Donna Artola, who was the workers’ compensation manager at NTW’s corporate headquarters. Because Hatch had been away from work since December 2005, on May 16, 2006, Fox sought information from Robert Ben-Eliyahu, a human-resources manager for NTW, on whether Hatch could be discharged pursuant to NTW company policy. Ben-Eliya-hu contacted Artola via electronic mail (“email”) on that same date about the possibility of discharging Hatch. Artola, in a responding e-mail message sent on May 17, 2006, explained that the company records showed that Hatch had been on leave only since February 26, 2006, but that he was coming up on the expiration of his leave of absence and could be discharged under company policy at that time. It is undisputed that Fox, Artola, and Ben-Eli-yahu did not know that Dr. Poczatek had placed Hatch at MMI on May 16, 2006.
 

 Artola contacted Hatch by telephone and subsequently by letter to inform him that his leave of absence was due to expire on May 25, 2006, and that he would be discharged on that date if he had not yet been released to return to work by his physician. In the letter, Artola assured Hatch that his discharge would have no effect on his workers’ compensation claim and that he would be eligible for rehire once he obtained a physician’s release form permitting him to resume the activities of his position. Hatch did not tell Artola that he had been placed at MMI on May 16, 2006. Hatch’s discharge became effective on May 25, 2006.
 

 
 *626
 
 Copies of NTW’s employee handbooks are in the record on appeal. The first handbook, which was effective until January 2006, contains the following pertinent provisions:
 

 “Non-Family and Medical Leave Act (FMLA) Disability Leave. Up to 3 months in the case of medical disability. The specific period will be limited to the period of disability certified by a physician.”
 

 “Return to Work
 

 “If you are on a disability or medical disability leave of absence, you must return to work when your physician or a company-appointed physician determines that you are able to resume normal duties. We require your physician’s written release before reinstatement to the active payroll. If you wish to extend your leave beyond this point, you must apply for a personal leave of absence. Failure to return from an approved leave when released by your physician or when directed will be considered a resignation of employment.
 

 “A physician’s written release will be required when returning to work from other short-term, medical related absences.”
 

 The 2006 handbook contains the following similar provisions:
 

 “Medical Leave of Absence — A Medical Leave of Absence may be granted to active regular, full-time employees with at least 90 days of active service, who has been medically certified to be unable to perform the essential functions of his/ her job. This is an unpaid leave, granted up to six 6 weeks (with physician’s certification). Further extensions to this leave may be granted with:
 

 “• Physician certification that employee is unable to return to work at the end of the initial time period;
 

 “•An updated estimate of when the employee will be able to return to work.
 

 “1. This leave may be taken on an intermittent basis (not all at one time) when medically necessary.
 

 “2. [NTW] may require an employee on intermittent leave to transfer temporarily to an available alternative position for which employee is qualified, if the position has equivalent pay and benefits and better accommodates recurring period of leave than the employee’s regular position.”
 

 “Return to Work — If you are on a disability or medical disability leave of absence, you must return to work when your physician or a company-appointed physician determines that you are able to resume normal duties. We require your physician’s written release before reinstatement to the active payroll. If you wish to extend your leave beyond this point, you must apply for a personal leave of absence. Failure to return from an approved leave when released by your physician or when directed will be considered a resignation of employment. A physician’s written release may also be required when returning to work from other short-term, medical related absences. Your supervisor will advise you of this requirement, which depends on case-by-case circumstances.
 

 “If an employee is unable to return to work at the end of the 12 weeks, and all other leave options have been exhausted, a final letter of termination is sent, advising of termination and any available benefits. If you are released by your
 
 *627
 
 physician and choose to apply for employment with [NTW], you will need to complete the new hire process, and should you return within one year of your termination date, your seniority will be reinstated. However, the normal waiting period for benefits will apply.”
 

 Hatch sued NTW, seeking workers’ compensation benefits and alleging that NTW had discharged him from employment in violation of Ala.Code 1975, § 25-5-11.1, which prohibits an employer from discharging an employee solely because the employee has filed a workers’ compensation claim. The trial court ordered that the two claims would be tried separately pursuant to Rule 42(b), Ala. R. Civ. P., but it declined to sever the two claims into separate actions pursuant to Rule 21, Ala. R. Civ. P. NTW moved for a summary judgment on Hatch’s retaliatory-discharge claim on March 14, 2008; after Hatch responded to that motion, the trial court entered a summary judgment in favor of NTW on the retaliatory-discharge claim on March 31, 2008. On April 23, 2008, Hatch filed what purported to be a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P.; however, at that point, the trial court’s summary-judgment order was not a final judgment because Hatch’s workers’ compensation claim had not yet been resolved. Hatch and NTW settled the workers’ compensation claim, and the trial court entered a judgment approving the settlement on April 30, 2008. At that point, because the summary-judgment order became final upon the entry of the judgment approving the settlement, Hatch’s postjudgment motion became effective,
 
 see New Addition Club, Inc. v. Vaughn,
 
 903 So.2d 68, 72 (Ala.2004); the trial court denied Hatch’s postjudgment motion on May 16, 2008. Hatch appealed the summary judgment on his retaliatory-discharge claim to the Alabama Supreme Court on May 29, 2008; that court transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).
 

 We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3);
 
 see Lee v. City of Gadsden,
 
 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ”
 
 Lee,
 
 592 So.2d at 1038 (footnote omitted). “[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989);
 
 see
 
 Ala.Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw.
 
 See Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C.,
 
 792 So.2d 369, 372 (Ala.2000); and
 
 Fuqua v. Ingersoll-Rand Co.,
 
 591 So.2d 486, 487 (Ala.1991).
 

 To establish a prima facie case of retaliatory discharge, a discharged employee must establish that the employee and the employer had an employment relationship, that the employee suffered a work-related injury, that the employer knew that the employee had suffered a
 
 *628
 
 work-related injury, and that the employee was subsequently discharged based solely on the employee’s having filed a workers’ compensation claim arising from the work-related injury.
 
 See Massey v. Krispy Kreme Doughnut Corp.,
 
 917 So.2d 833, 836-37 (Ala.Civ.App.2005) (quoting
 
 Alabama Power Co. v. Aldridge,
 
 854 So.2d 554, 563 (Ala.2002)). Because direct evidence demonstrating that an employer has discharged an employee solely because the employee has filed a workers’ compensation claim is not often easily obtained, an employee by may establish by circumstantial evidence that the actual reason for the discharge was the employee’s filing of a workers’ compensation claim.
 
 Alabama Power Co. v. Aldridge,
 
 854 So.2d 554, 564-65 (Ala.2002). In
 
 Aldridge,
 
 our supreme court discussed seven factors that a court may consider in determining whether the necessary causal relationship between the employee’s workers’ compensation claim and that employee’s discharge exists; evidence indicating the existence of those factors is circumstantial evidence indicating that the discharge was in retaliation for filing a worker’s compensation claim.
 
 Aldridge,
 
 854 So.2d at 564-65. In addition to proximity of time between the filing of a claim and the discharge,
 
 id.
 
 at 566, the
 
 Aldridge
 
 court identified the following six factors:
 

 “ 1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee’s injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee’s work performance evaluations following a workers’ compensation claim, and 6) evidence that the stated reason for the discharge was false.’ ”
 

 Id.
 
 at 564-65 (quoting
 
 Chhim v. University of Houston,
 
 76 S.W.3d 210, 218 (Tex.Ct.App.2002)).
 

 Once a discharged employee has demonstrated a prima facie case of retaliatory discharge, the burden shifts to the employer to establish a legitimate reason for the employee’s discharge. Ford
 
 v. Carylon Corp.,
 
 937 So.2d 491, 501 (Ala.2006). Once the employer has advanced a legitimate reason for the discharge, the burden again shifts to the discharged employee, who must present evidence demonstrating that the legitimate reason advanced by the employer is a mere pretext.
 
 Flint Constr. Co. v. Hall,
 
 904 So.2d 236, 250 (Ala.2004). If the employer is able to establish a legitimate reason for the discharge and that reason is uncontradicted, the employer is entitled to a judgment as a matter of law in its favor.
 
 Aldridge,
 
 854 So.2d at 568.
 

 “An employer’s stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers’ compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status.”
 

 Id.
 

 NTW moved for a summary judgment, arguing that it had a legitimate reason for discharging Hatch: the expiration of his leave of absence. The pre-2006 NTW employee handbook permits an employee a three-month leave of absence for medical disability. The 2006 NTW employee handbook permits a medical leave of absence for 6 weeks, but it later mentions that the
 
 *629
 
 leave period is limited to 12 weeks. NTW apparently based its decision that Hatch’s leave period had expired on the pre-2006 employee handbook because it permitted him a three-month leave of absence, based on the start date of February 26, 2006. This conclusion is supported by Artola’s statement in her e-mail response to Ben-Eliyahu’s query regarding when Hatch could be discharged. Artola noted that she had originally been unaware of Hatch’s leave of absence and that she “had to start the [leave of absence] late and give him his 90 days.”
 

 NTW argues that the trial court properly entered a summary judgment in its favor because Hatch did not prove the necessary causal connection between his filing a workers’ compensation claim in October 2005 and his discharge in May 2006. NTW also contends that Hatch did not demonstrate that its stated reason for his discharge — that his leave of absence had expired — was pretextual. Hatch, however, argues that he presented substantial circumstantial evidence supporting a conclusion that his workers’ compensation claim was the sole motivating factor for his discharge and substantial evidence indicating that NTW’s stated reason for the discharge was pretextual.
 

 As noted above, a discharged employee may prove the necessary causal link between the employee’s discharge and the employee’s filing of a workers’ compensation claim with circumstantial evidence.
 
 Aldridge,
 
 854 So.2d at 565-65. Hatch argues that the fact that Fox desired to discharge him on the same date that Dr. Poczatek placed him at MMI satisfies the “proximity” factor mentioned in
 
 Aldridge. Id.
 
 at 565. The factor mentioned in
 
 Aldridge
 
 was the proximity of time between the filing of a workers’ compensation claim and the date of the discharge of the employee. Naturally, a close relationship in time between the filing of a workers’ compensation claim and an employee’s discharge could give rise to an inference that the two events were connected.
 
 Id.
 
 at 565. Hatch was not discharged until seven months after he filed his workers’ compensation claim; the two events do not appear to be “proximate.” The lack of proximity of time between the filing of Hatch’s workers’ compensation claim and his discharge is not circumstantial evidence indicating that the sole motivating factor in Hatch’s discharge was the filing of his worker’s compensation claim.
 

 As we understand it, Hatch’s argument regarding “proximity” is actually different from that mentioned in
 
 Aldridge.
 
 Hatch argues that Fox, Artola, and Ben-Eliyahu chose to discharge him on or around the same date Hatch’s authorized treating physician found him to be at MMI, and Hatch appears to argue that the proximity of those two events is also circumstantial evidence indicating that his discharge was motivated solely by his filing of a workers’ compensation claim. However, NTW had been providing workers’ compensation benefits to Hatch for months, and he had been on leave as a result of his injury. The timing of the discharge and the assignment of MMI around the same date appears to be nothing but a coincidence. We fail to see how the proximity between Dr. Poczatek’s assignment of MMI, which none of the decision makers knew about, and Hatch’s discharge would lead to an inference that the filing of Hatch’s workers’ compensation claim was the motivation for his discharge.
 

 Hatch further argues that he established that Artola and Fox knew of his workers’ compensation claim.
 
 See Flint Constr. Co.,
 
 904 So.2d at 247. NTW concedes that both Artola and Fox had knowledge of the claim. However, this evidence alone is not sufficient to demonstrate that
 
 *630
 
 Hatch’s workers’ compensation claim was the sole motivating factor in the decision to discharge him.
 

 Hatch again relies on the proximity of time between his being placed at MMI and his discharge as evidence of a negative attitude toward his condition. As noted previously, Hatch failed to present evidence indicating that those making the decision to discharge him knew of the MMI determination. Hatch also argues that LeDoux’s alleged contact with his physician’s office on an unspecified date also demonstrates a negative attitude. Even assuming, as we must, that LeDoux attempted to contact one of Hatch’s physicians, we cannot agree that such action demonstrated a negative attitude toward Hatch’s injured condition by LeDoux. Hatch did not explain what information LeDoux sought, and, thus, he did not prove that LeDoux’s actions were motivated by a negative attitude toward Hatch’s injured condition. Without evidence of the date of the alleged contact or the information that LeDoux attempted to elicit, we cannot reasonably infer that LeDoux’s behavior was motivated by a negative attitude toward Hatch’s injured condition. Thus, Hatch failed to present substantial evidence creating a genuine issue of material fact regarding the demonstration of a negative attitude toward his injured condition by anyone affiliated with NTW.
 

 Hatch further argues that the fact that he was permitted by LeDoux to take a light-duty counter position despite NTW’s policy of not providing light-duty work to injured employees and the fact that NTW allowed Hatch more than a three-month leave of absence demonstrates that NTW failed to adhere to its own company policy and, therefore, is circumstantial evidence of the necessary causal link between the filing of his workers’ compensation claim and his discharge. Hatch would have us infer that LeDoux’s actions in allowing Hatch to work within his ability out of compassion despite the lack of a company policy creating light-duty positions and NTW’s decision to discharge Hatch after his
 
 official
 
 leave of absence expired and not before constitute substantial evidence indicating that NTW’s stated reason for Hatch’s discharge was a mere pretext. We have considered, and rejected, a similar argument before.
 
 See Walker v. DCH Reg’l Med. Ctr.,
 
 853 So.2d 221, 228 (Ala.Civ.App.2002). Although we cannot necessarily say that an employer’s failure to follow company policy in such a manner that benefits the employee would never amount to circumstantial evidence indicating that the employer has as its purpose to discharge an employee in violation of § 25-5-11.1, in this particular case we can discern no reasonable inference that Le-Doux’s or NTW’s actions were linked to a decision to discharge Hatch solely because he filed a workers’ compensation claim.
 
 Walker,
 
 853 So.2d at 228.
 

 Hatch next argues that NTW gave different reasons for his discharge, thus, he says, creating an issue whether the stated reason was, in fact, false.
 
 Flint Constr.,
 
 904 So.2d at 251-52 (discussing a demonstration of pretext based on discrepancies in the stated reasons for the discharge by the employer). NTW representatives did give differently worded statements regarding the reason that Hatch was discharged. Artola’s letter referred to the expiration of Hatch’s leave of absence, while Fox testified in his deposition that Hatch had been discharged because he had failed to maintain contact concerning his condition, had failed to apprise the company of his expected date of return, and had exceeded his “allotted time.” The printout of NTW’s computerized records indicated that Hatch’s “RES Family Leave Expires” and indicates the date of expiration to be May 31, 2006. Although there are slight
 
 *631
 
 differences in the expression of the reason for Hatch’s discharge, the underlying ground for discharge remains the same in each example above — -Hatch’s leave of absence expired. We cannot agree that the slight differences in the expression of the stated reason amount to a material factual difference that would require sending the case to a jury.
 

 Hatch’s final argument that he presented substantial evidence indicating that his filing of a workers’ compensation claim was the sole motivating factor in his discharge is that the evidence demonstrates a pattern of retaliatory conduct by NTW.
 
 See Massey,
 
 917 So.2d at 839 (discussing showing pretext by establishing that a stated reason for discharge has been applied in a discriminatory manner to those employees who have filed workers’ compensation claims). Hatch first argues that his failure to report a 1998 back injury, which occurred when he worked for Sears, is evidence that NTW had a pattern and practice of trying to avoid workers’ compensation liability. Although the record indicates that the tire division of Sears was purchased by NTW, the record does not establish that Sears was a predecessor company to NTW or that NTW would be responsible for any acts of Sears. In any event, the fact Hatch seeks to establish is immaterial. Hatch must show that the stated reason for his discharge was applied in a discriminatory manner to him because he filed a workers’ compensation claim, not that NTW had a pattern of avoiding paying workers’ compensation claims.
 
 See id.
 

 Hatch also presented the affidavit of a co-employee, Russell E. Spencer, to establish that NTW has a pattern and practice of applying “the stated basis ... in a discriminatory manner to employees who have filed workers’ compensation claims.”
 
 Aldridge,
 
 854 So.2d at 568. Spencer’s affidavit reads as follows:
 

 “1. My name is Russell E. Spencer and I am over the age of nineteen years. I am a resident of the State of Alabama and I have personal knowledge of the matters set forth herein.
 

 “2. I worked for NTW, Inc. from August 2004 until January 2006. While working for NTW, Inc., I held the positions of Salesperson, Sales Manager, and Service Manager. Also, while employed with NTW, Inc. I worked at the Galleria, Highway 280 and Homewood store locations.
 

 “3. In May of 2005, I sustained an on-the-job injury and made a claim for worker’s compensation benefits. Immediately, after my on-the-job accident, my supervisor, Mr. Randy Sparks, began expressing a negative attitude regarding my claim/injuries. For example, Mr. Sparks called NTW’s worker’s compensation insurance carrier and told the claims representative handling my claim that I was ‘faking’ my injuries. Also, Mr. Sparks later threatened to void a promotion I was being offered if I didn’t return to work before my worker’s compensation authorized physician released me. I eventually left his store (Galleria) and took a demotion, obtaining a job at NTW’s Homewood store. Once there, Mr. Sparks kept calling my supervisor inquiring about my attendance, work attitude, etc. I am unaware of Mr. Sparks doing this with anyone else.
 

 “4. In January 2006, I was terminated by NTW. Prior to that date, NTW’s Area Manager, Garry Fox and I had conversations regarding my return to work and my worker’s compensation claim.
 

 “5. Also, after being released by my physicians to return to work, NTW, Inc., refused to reinstate me in violation of its leave of absence polices.
 

 
 *632
 
 “6. It is my belief that I was terminated and not reinstated because I filed a worker’s compensation claim.”
 

 What Spencer’s affidavit does not establish is of the most import. Spencer does not state the reasons that NTW gave for his discharge. The affidavit does not clearly indicate whether and how long Spencer was on a leave of absence after his injury. Paragraph 3 would support an inference that Spencer returned to work for some time after his accident. Spencer states that he and Fox had conversations about his return to work and his workers’ compensation claim, but Spencer does not recount those conversations or indicate that they were negative. Although Spencer states that he believes his discharge and NTW’s failure to rehire him stemmed from his filing a workers’ compensation claim against NTW, the affidavit does not clearly demonstrate that NTW has a policy of applying its policies unfairly to those employees who do file a workers’ compensation claim. Spencer’s affidavit is evidence of nothing other than that he was discharged at some point after filing a workers’ compensation claim. It does not establish that NTW had a practice of applying the stated reason for Hatch’s discharge in a discriminatory manner against those employees who filed workers’ compensation claims.
 

 Notably, in his deposition, Hatch was asked for evidence that he believed established that he was discharged solely for filing his workers’ compensation claim. Hatch explained that he knew of a co-employee by the first name of “Mark” who had been injured, had had surgery, and had been out a “long time,” but who was permitted to return to his position once he had recovered. Hatch claimed that Mark’s differing experience evidenced NTW’s retaliatory intent in discharging him before he was recovered from his work-related injury. As counsel for NTW pointed out, however, Mark’s story actually disproved Hatch’s allegation that NTW discriminated against those employees who made workers’ compensation claims by discharging them from employment.
 

 Finally, NTW argues that the fact that Hatch admits that he was unable to perform the duties of his employment triggers the application of the “willing and able” doctrine,
 
 see Bleier v. Wellington Sears Co.,
 
 757 So.2d 1163, 1171-72 (Ala.2000), which, NTW contends, mandates an affirmance of the summary judgment in its favor. NTW is only partly correct. The “wiling and able” doctrine may be used by an employer to establish a defense to an employee’s retaliatory-discharge claim, but it does not automatically mandate an affir-mance of a judgment in favor of the employer.
 
 Dunn v. Comcast Corp.,
 
 781 So.2d 940, 943-44 (Ala.2000) (discussing the application of the “willing and able” doctrine as a defense to a retaliatory-discharge claim). Instead, a trial court considering a summary-judgment motion on a retaliatory-discharge claim should consider whether the employer has established the “willing and able” defense, along with any others, and whether the employee has presented sufficient evidence to rebut the employer’s showing to create a question of fact regarding whether the stated reason for discharge is a pretext.
 
 Dunn,
 
 781 So.2d at 943. “[I]f a genuine issue of material fact exists as to whether the non-retaliatory reason given by the employer was actually the basis for the discharge, then a summary judgment would not be appropriate.”
 
 Id.
 
 We have considered NTW’s stated reason for Hatch’s discharge, and we have considered and rejected Hatch’s arguments that he presented substantial evidence indicating that NTW’s reason for his discharge was a mere pretext. The fact that Hatch was
 
 *633
 
 unable to resume his duties only serves to further bolster the conclusion that NTW’s stated reason for Hatch’s discharge — that his leave of absence had expired — was not a pretext for a retaliatory discharge.
 

 Hatch has failed to present substantial evidence indicating that NTW’s decision to discharge him was motivated solely by his filing a workers’ compensation claim. Furthermore, Hatch has failed to create a genuine issue of material fact concerning whether NTWs stated reason for his discharge — the expiration of his leave of absence — was merely a pretext. Accordingly, we affirm the summary judgment in favor of NTW on Hatch’s retaliatory-discharge claim.
 

 AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.